IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| RHINO MEMBRANES AND COATINGS INC., <br>        *Plaintiff* <br> v. <br><br> RHINO SEAMLESS MEMBRANE SYSTEM, INC.; EUROTEX INTERNATIONAL, INC.; HISHAM WASFI AYOUB; and *In Rem* "RhinoSMS.com", <br>        *Defendants* | CIVIL ACTION NO. H-06-2112 |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION.**

Pending before the court is Plaintiff Rhino Membranes and Coatings Inc.'s ("Rhino") motion for preliminary injunction. Rhino's complaint alleges claims for (1) violation of the Lanham Act[1]; (2) violation of the Copyright Act[2]; (3) declaratory relief; (4) infringement on common law trademark rights and injury to business reputation; (5) misappropriation of trade secrets and confidential information; (6) violation of the Texas Tort Liability Act[3]; (7) conversion; (8) tortuous interference with existing and prospective business relations and contracts; (9) fraud; (10) unfair competition; and (11) breach of written distributorship agreement. Comp. at ¶ 67-130.

On July 12, 2006, a hearing was held before the court. Rhino presented the testimony of several witness and submitted voluminous physical evidence. Defendants appeared through counsel. For the following reasons, the court **ORDERS** that Plaintiffs motion for preliminary injunction is **GRANTED**.

**II. FACTS[4]**

---

[1] Title 15 United States Code Section 1051, *et seq*.

[2] Title 17 United States Code Section 101, *et seq*.

[3] Tex. Civ. Prac. & Rem. Code Ann. §§ 134.001 – .005.

[4] The facts are drawn from Plaintiff's verified complaint, which was sworn to by David Caston, a director of Rhino, and the hearing testimony of Messrs. Caston, Mckinzie, and Quinlan.

Rhino is a Texas corporation in the business of producing and selling spray on products used in waterproofing, roofing, corrosion prevention, and pond and landfill lining. Comp at ¶ 15. Defendant Rhino Seamless Membrane Systems Inc. ("Rhino SMSI") is a Texas Corporation with offices in Saudi Arabia.  Comp. at ¶ 5.  Defendant Eurotex International Inc. ("Eurotex") is a Dubai, United Arab Emirates, corporation formerly incorporated or registered to do business in Texas. Comp. at ¶ 6.  Defendant Hisham Wasfi Ayoub ("Ayoub") is an American citizen and the president of both Eurotex and Rhino SMSI. Comp. at ¶ 7.

Rhino has been in business since 1994.  In connection with its business, it uses a trademark consisting of word rhino, the letter "r" being stylized to resemble a rhinoceros horn, and a caricature of a blue rhinoceros.  *See* hearing testimony of Michael E. Quinlan ("Quinlan").  Rhino is well known in the industry and has sold its product around the world.  *Id.*  In March 1997, Rhino registered its trademark under registration number 2,044,513 ("the 513 Registration").  *See* Certificate of Registration (Plaintiff's Ex. B). Rhino failed to file its sixth year declarations in 2003 and the 513 registration was allowed to lapse. Comp. at ¶ 42.  In March 2006, however, Rhino filed a new application ("the 877 application"), and was awarded an expedited hearing. Comp. at ¶ 42. On April 20, 2006, the USPTO advised Rhino that its application was in condition for allowance. Comp. at ¶ 42. On June 27, 2006, Rhino's mark was published for opposition.  *See* USPTO Notice of Publication (Plaintiff's Ex. R-1).

Rhino's relationship with Ayoub began in 1998 when the parties entered into a distributorship agreement ("the agreement").  *See* Distributorship Agreement (Plaintiff's Ex. I). The agreement awarded Eurotex a sole distributorship in Qatar, UAE, Bahrain, Saudi Arabia, Kuwait, Oman and Yemen ("the territory").  Comp. at ¶ 23. Numerous clauses in the agreement govern the use of Rhino's intellectual property (IP).[5] *See* Distributorship Agreement §§ 10.3, 14.2,

---

[5]The agreement defines intellectual property as

"All Trade Marks (as defined herein), trade names, service marks, copyrights, patents, registered designs, confidential information including trade secrets and know-how, and other intellectual property rights used in relation to the processing, manufacture, sale, supply, use and application of the Products and the System.  As used herein Trade marks means all of the registered and unregistered trade names and trade marks, service marks, slogans, logos, emblems and designs which identify the Products and the business of supplying the Products." Distributorship Agreement at § 18.1

18.2, 18.4 - 18.9). Generally, they provide that Eurotex acknowledges Rhino's exclusive ownership of its IP, promises not to adopt a corporate name similar to Rhino's, and agrees to follow Rhino's directives regarding its IP. *Id.* Finally, the agreement also requires Eurotex, on Rhino's behalf, to acquire protection for Rhino's IP in the territory. *Id.*

During the term of the agreement, Ayoub gained access to a substantial portion of Rhino's IP. It also became privy to confidential information, including how to optimize the application of Rhino's products in the territory and a chemical formulation of the product designed for use in high heat environments. Comp. at ¶¶ 26, 31. Proprietary information was also disclosed regarding the identification and servicing of customers, market applications, specifications, and the sources for the raw materials used to produce Rhino's product. Comp. at ¶ 32. Michael McKinzie, one of Rhino's witnesses, testified that Mr. Ayoub, even while he was acting as a distributor, was holding himself out as the owner and originator of Rhino's product.

In May 2003, Rhino ended its relationship with Ayoub and his companies. Soon afterwards, Ayoub, acting as president of Rhino SMSI, filed an intent-to-use trademark application with the USPTO directed at the Rhino logo and blue Rhino caricature.[6] Comp. at ¶ 45. Ayoub also registered the Rhino logo and caricature in Saudi Arabia. *See* Trademark Registration Certificate Issued by Kingdom of Saudi Arabia (Plaintiff's Ex. T); Comp. at ¶ 47.

In September 2004, Ayoub ordered one specially manufactured tote of Plaintiff's product. Comp. at ¶ 36. Ayoub then used the tote in a bait and switch scheme, demonstrating the product's capabilities using the legitimate product and then substituted his own inferior product. This product, which was used in a large project, failed to perform to specifications. *See* JUPC Inspection Report (Plaintiff's Ex. Z-14). McKinzie, an officer of the company that purchased the product, testified that the failure harmed Rhino's reputation. Further investigation by Rhino revealed that, during this period, Ayoub was contacting Rhino's raw materials suppliers in the United States to make his product and soliciting business in the Middle East using brochures virtually identical to those copyrighted by Rhino. *See* Defendant's Brochure (Plaintiff's Ex. X). The brochure directs

---

[6] Rhino SMSI, which abandoned its application in April 2006, revived it on 1 May 2006. *See* Petition for revival (Plaintiff's Ex. S); Comp. at ¶ 45.

interested parties to a website, "RhinoSMS.com" that contains the Rhino trademark, but directs customers to the offices of Ayoub. *See* Screen Shot of RhinoSMS.com (Plaintiff's Ex. Y).

Since early 2006, Ayoub has been contacting Rhino dealers and customers and asserting his superior right to the product and trademark. *See* Demand Letter (Plaintiff's Exhibit U); Comp. at ¶ 48. Specifically, in March 2006, Ayoub sent a demand letter to Rhino's exclusive applicator in the territory, the Mohamed Al Mojil Group ("MMG"). The letter threatens legal action if MMG continues dealing in Rhino products. According to Quinlan, Caston, and McKinzie, the legal uncertainty that now surrounds Rhino's use of its mark threatens its continued viability in the region.

## III. LEGAL STANDARD

### A. *Preliminary Injunction*

Before issuing a preliminary injunction, the district court must determine that (1) the movant has a substantial likelihood of success on the merits; (2) the movant will suffer irreparable injury if the preliminary injunction is not granted; (3) the harm to the movant outweighs the harm to the opposing party if the preliminary injunction is granted; and (4) the preliminary injunction is in the public interest. *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 265 (5th Cir. 1999); *Canal Auth. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).

### B. *Extra-Territorial Application of the Landham Act*

The lead case in the Fifth Circuit on the extraterritorial application of the Landham Act is *American Rice Inc. v. Arkansas Rice Growers Co-op Assoc.*, 701 F.2d 408 (5th Cir. 1983). In that case, American Rice Inc. ("ARI") sued the Arkansas Rice Growers Co-operative Association ("Riceland") for trademark infringement based on its sales, in Saudi Arabia, of rice labeled in a confusingly similar manner to ARI's. *Id.* at 410-412. After holding a hearing, the district court found that ARI had shown a substantial likelihood of success on the merits and issued a preliminary injunction preventing defendant's sale of infringing products in Saudi Arabia.[7]

---

[7] The district court ordered the defendant to post a bond of $25,000, subsequently increased to $458,268.42, and prohibited it from

> using, directly or indirectly, in any manner, in connection with its rice sales, packaging, exportation and promotion, a single girl design trademark, single girl tradename, and the red-yellow-black trade dress in conjunction with the single girl design trademark, or any other colorable imitation or simulation of the Abu Bint trademark and dress, which

Riceland immediately appealed the district court decision to the Court of Appeals arguing that the district court lacked jurisdiction to issue an injunction under the Lanham Act. *Id.* at 412. Affirming the district court's order, the Fifth Circuit concluded that

> Under *Bulova* and *Luft* certain factors are relevant in determining whether the contacts and interests of the United States are sufficient to support the exercise of extraterritorial jurisdiction. These include the citizenship of the defendant, the effect on United States commerce, and the existence of a conflict with foreign law. The absence of any one of these is not dispositive. Nor should a court limit its inquiry exclusively to these considerations. Rather, these factors will necessarily be the primary elements in any balancing analysis.

701 F.2d at 414 (citing *Steele v. Bulova Watch Co.*, 344 U.S. 280 (1952), and *George W. Luft Co. Inc. v. Zande Cosmetic Co. Inc.*, 142 F.2d 536 (2d Cir. 1944)). These three factors, citizenship, effect on U.S. commerce[8], and conflict with foreign law, have come to be known as the *Bulova* factors. Applying the *Bulova* factors in *American Rice*, the Court of Appeals found (1) that Riceland was an American citizen, (2) that it had affected United States commerce by producing goods in the United States and sending them to Saudi Arabia where they diverted sales away from ARI, and (3) that Riceland's Saudi trademark did not create conflict of laws because no Saudi court had ever awarded Riceland a superior right to use the mark. *Id.* at 415.

## IV. APPLICATION OF LAW TO THE FACTS

Rhino has satisfied every element necessary to obtain a preliminary injunction. Where, as here, the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself. *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir. 1983). Rather, the court must examine the registered mark, determine whether it is inherently distinctive, and compare it against the challenged mark. *Id.* Here, Rhino has shown that the mark used by Defendants is not only similar, but identical to its own. *See* Plaintiff's Exhibits A, B, C, F, K, L, P, Q, R, S, T, X, and Y. Therefore, there is a substantial likelihood that Rhino will succeed on the merits of its trademark claims. Rhino has also demonstrated that the court's failure to enter

---

limitation or simulation may amount to an act of unfair competition, and thus, may cause confusion in the Saudi Arabian consuming public such that the public may erroneously believe or assume Riceland's business or rice is related to or sponsored by ARI's business or rice.

[8] In *American Rice* the Court of Appeals held that the infringing behavior need not have a "substantial effect" on U.S. Commerce, but rather "some effect." 701 F.2d at 414n.8.

a preliminary injunction would result in its irreparable injury.  Caston, Mckinzie, and Quinlan testified that Rhino's good will has already been severely compromised by Defendant's actions and that Rhino is currently fighting to preserve its reputation in the territory. Further, the harm to Rhino's good will, developed over more than a decade, outweighs the harm to Defendants, who have not introduced any evidence that they have any right to use Rhino's mark in commerce. Finally, the public interest in correctly branded products weighs in favor of granting Rhino's motion.

Rhino has also succeeded in satisfying the three *Bulova* factors.  First, Ayoub and Rhino SMS are both United States citizens.  Second, Rhino has shown that Defendants sourced their infringing products in the United States and sold them in Saudi Arabia, diverting business from Rhino. Third, as in *American Rice*, no Saudi court has determined that Defendants have a legal right to use Rhino's marks, or that those marks do not infringe on Rhino's mark.  701 F.2d 408, 415-416 (1983).

## V. CONCLUSION

For the aforementioned reasons, the court **ORDERS** that Plaintiff's motion is **GRANTED**. Plaintiff's shall post a bond of $25,000.  Defendants are preliminary enjoined from directly or indirectly

1. Using, as a service mark, trademark, trade name, trade dress, or domain name, any of Plaintiff RhinoMCI's RHINO Trademarks, or any other name, mark, or trade dress confusingly similar to Plaintiff Rhino MCI's RHINO Trademarks, such as the RHINO SMS mark and logo and the RhinoSMS.com domain name, or trade dress, alone or in combination with other words, names, styles, titles, marks or trade dress in connection with the advertising, marketing, manufacturing or offering of any spray-applied product used for waterproofing, corrosion proofing; waterproofing liquid/paint; waterproofing membranes in liquid chemical form for use in construction; waterproof paint; and sealer coatings that create impervious membranes for use in containment protection and barriers for and against solids, fluids and gases;

2. Holding themselves out as the owner of, or a distributor, agent or applicator authorized to use, the RHINO Trademarks, RHINO Original Works, Rhino Trademarked Products; or RHINO Intellectual Property;

**3.** Performing any actions or using any words, names, styles, designs, trade dress, titles or marks, which are likely to cause confusion, to cause mistake or to deceive; or to otherwise mislead the trade or the public into believing that Plaintiff and Defendants are one and the same or are in some way connected; of that Defendants are in some manner affiliated or associated with or under the supervision or control of Plaintiff; or that the products and services of Defendants originate with Plaintiff Rhino MCI or are produced, marketed or offered with the approval, consent or authorization, or under the supervision of Plaintiff Rhino MCI; or are likely in any way to lead the trade or the public to associate Defendants with Plaintiffs or to associate Plaintiffs with Defendants.

**4.** Using any words, names, styles, designs, trade dress, titles or marks which create a likelihood of injury to the business reputation of Plaintiff Rhino MCI or a likelihood of misappropriation or dilution of Plaintiff MCI's name, mark or trade dress and the goodwill associated therewith;

**5.** Using any practice whatsoever including those complained of herein, which tend to unfairly compete with or injure Plaintiff Rhino MCI's business and the goodwill appertaining thereto;

6. Infringing Plaintiff Rhino MCI"s copyrights in its RHINO Original Works or continuing to market, offer, sell, dispose of, license, lease, transfer, display, advertise, reproduce, develop or manufacture any works derived or copied from Plaintiff Rhino MCI's RHINO Original Works or to participate or assist in any such activity;

**7.** Using or disclosing Plaintiff Rhino MCI's trade secrets and confidential information;

**8.**     Using the RhinoSMS.com domain name;

**9.**     Asserting the Rhino SMS Saudi Arabian Trademark Registration; and seeking registration of the trademark Rhino, the Rhino logo, the Rhino SMS mark or any combination thereof in the United States Patent & Trademark Office, including the pending Rhino SMSI Trademark Application.

Signed at Houston, Texas this 14th day of July, 2006.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE