**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| RHINO MEMBRANES AND COATINGS INC., | } | |
| | } | |
| | } | |
| *Plaintiff*, | } | |
| v. | } | Civil Case No.  4:06-cv-2112 |
| | } | |
| RHINO SEAMLESS MEMBRANE SYSTEM, INC.; EUROTEX INTERNATIONAL, INC.; HISHAM WASFI AYOUB; and *In Rem* "RhinoSMS.com", | } } } } | |
| | } | |
| *Defendants*. | } | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Rhino Membranes and Coatings Inc.'s ("Rhino MCI") complaint alleges claims for (1) violations of the Lanham Act[1]; (2) violations of the Copyright Act[2]; (3) declaratory relief; (4) infringement on common law trademark rights and injury to business reputation; (5) misappropriation of trade secrets and confidential information; (6) violations of the Texas Tort Liability Act[3]; (7) conversion; (8) tortious interference with existing and prospective business relations and contracts; (9) fraud; (10) unfair competition; and (11) breach of a written distributorship agreement.  The Court held a bench trial on these claims on October 9, 2007.  Accordingly, the Court hereby issues this Findings of Fact and Conclusions of Law with respect to Plaintiff's claims.

---

[1] 15 U.S.C. § 1051 *et seq.*

[2] 17 U.S.C. § 101 *et seq.*

[3] Tex. Civ. Prac. & Rem. Code Ann. §§ 134.001 – .005.

# FINDINGS OF FACT[4]

1.   Defendant Hisham Ayoub ("H. Ayoub") is the principal and alter ego of Defendants Eurotex International, Inc. ("Eurotex") and Rhino Seamless Membrane Systems, Inc. ("Rhino SMSI").

2.   Defendant H. Ayoub formed his company, Defendant Eurotex, in 1998 for the purpose of marketing the RHINO Trademarked Products[5] in the Middle East.

3.   Defendant H. Ayoub's brother, Mohammed Wasfi Ayoub ("M. Ayoub"), previously interacted with Plaintiff Rhino MCI during the term of the Distributorship Agreement (the "Agreement") and is presently acting in concert with Defendants.  Defendant M. Ayoub has not, however, been presented with a summons and notice of the present lawsuit, nor has a waiver of service been filed.

---

[4] The facts are drawn from the Admissions of Fact in the First Amended Joint Pretrial Order (Doc. 59), the trial testimony of David Caston, a Director of Rhino, ("Caston") and Plaintiff's Exhibits A to Z-33 entered into evidence at trial.

[5] Plaintiff's First Amended Verified Original Complaint states:

> Since about September 1994, Plaintiff Rhino MCI has been developing and providing unique spray-on products that can be used for water proofing, roofing, corrosion prevention, and pond and landfill lining.  These products contain a two-component elastomeric system of polymer modified bitumen (asphalt). Both components are waterborne, non-flammable liquids that present no storage or transportation hazards.  The products are non-hazardous, non-toxic, odorless and environmentally safe.  Plaintiff Rhino MCI's spray-applied system was developed in response to recurring failures encountered by conventional waterproofing systems.  These sealer coatings create impervious membranes for use in containment protection and barriers for and against solids, fluids and gases.  The finished product is seamless and fully bonds to most substrates. Using these membrane systems allows labor savings due to rapid application. The product demonstrates performance superior to pre-formed membrane and waterproofing systems in flexibility, elongation up to 1800%, recovery up to 95% and thermal cycling to cope with extreme climates of 35 to 80 deg. C. (hereafter "the RHINO Trademarked Products").

(Am. Compl., Doc. 35 at ¶ 15).

4.   Plaintiff's U.S. Trademark Registration No. 2,044,513 for the following mark:



was cancelled due to inadvertence.  From September 1994 to the present, however, Plaintiff has been the owner of all rights at common law in the above-referenced mark for the associated goods and related services pertaining to impervious membranes, namely, a polymer-modified asphalt emulsion for use in containment protection and barriers for and against solids, fluids, and gases for general industrial use.

5.   From about 1995 to the present, Plaintiff has been the owner of all common law rights in the following trademark combining the word "rhino" with the rhino caricature:



for the goods and associated services relating to sealer coatings that create impervious membranes for use in containment protection and barriers for and against solids, fluids, and gases.

6.   Plaintiff is and, at all relevant times, has been the owner of all rights, title, and interest in and to the RHINO caricature logo, including all related goodwill and all prior use established through its predecessor, Rhino Systems International Inc.

7.   Plaintiff has invested a great deal of time, research, and money into the development and commercialization of its RHINO Trademarked Products and, as a result, has built up considerable goodwill, customer recognition, distinction, and fame in its RHINO Trademarks.[6]  As part of its development of the RHINO Trademarked Products, Plaintiff has conducted a great deal of product research and testing directed to optimizing the products for the

---

[6] "The RHINO trademark, the RHINO logo, and the RHINO trademark registrations are hereinafter collectively referred to as the 'RHINO Trademarks.'"  (*Id.* at ¶ 17).

numerous intended applications, such as using them for waterproofing, roofing, corrosion prevention, and pond and landfill lining. In connection with this research, Plaintiff has compiled data on its products showing compliance with a litany of ASTM International standards covering product characteristics, such as elongation, tensile strength, puncture resistance, water absorption, thermal cycling, and aging, to name a few.

8. Plaintiff has established superior rights in the RHINO caricature logo for these goods and services both at common law and under federal trademark law.

9. Plaintiff has also optimized the chemistries used in its two-part system, namely the catalysts and the polymer and asphalt emulsion components. In so doing, Plaintiff has also optimized the application technologies needed to mix the two components on the fly via a pressurized pump spray system. The optimization of the system has required research and development efforts directed to the two chemical components, the ratios in which they are mixed, the pump pressures used during the spray application, and the spray nozzle and spray gun design and configurations. Additionally, Plaintiff has spent a great deal of effort in optimizing and, where customer applications so require, re-optimizing the specifications and techniques used for achieving the optimal spray-on application. At all times relevant to the present suit, Plaintiff has maintained these research and development efforts and know-how as its own confidential and trade secret information.

10. As part of the Agreement, Plaintiff provided Defendant Eurotex with access to its Intellectual Property ("IP"),[7] which includes the RHINO Trademarks, trade names, service

---

[7] The Agreement defines IP as follows:

> All Trade Marks (as defined herein), trade names, service marks, copyrights, patents, registered designs, confidential information including trade secrets and know-how, and other IP rights used in relation to the processing, manufacture, sale, supply, use and application of the Products and the System. As used herein Trade marks means all of the registered and unregistered trade names and trade

marks, copyrights, patents, registered designs, confidential information, including trade secrets and know-how (including quality assurance manuals, distributor's manuals, applicator manuals, design manuals, training, product developments, product specifications, formulations, raw materials, supplier information, manufacturing information, pricing and cost information, etc.), regarding the RHINO Trademarked Products and the systems for their application, as well as other information used in relation to the processing, manufacture, sale, supply, use, and application of the RHINO Trademarked Products and the system for such application. Defendant Eurotex agreed to purchase the RHINO Trademarked Products from Plaintiff.

11. As part of the September 15, 2001, amendment to the Agreement, Plaintiff would permit, and perhaps require, one of its Directors, Caston, to be employed by the distributor as an on-site technical and marketing consultant.

12. As part of Plaintiff's control and oversight of its RHINO Trademarked Products and other IP rights, and pursuant to the amendment to the Agreement, one of Plaintiff's directors, Caston, was seconded to Abdulla Fouad Ltd. Co. ("Fouad")[8] to serve in a direct consultancy role in the marketing, sales, and application of the RHINO Trademarked Products in the Territory.[9]

13. One of the first matters Caston handled on Plaintiff's behalf was arranging, with the Customs Office in Dammam, Saudi Arabia, all of the paperwork required for the importation of the RHINO Trademarked Products into Saudi Arabia.  This process included

marks, service marks, slogans, logos, emblems and designs which identify the Products and the business of supplying the Products.

(Distributorship Agreement, Pl.'s Trial Ex. I at ¶ 18.1).

[8] In approximately August 2002, Defendant H. Ayoub advised Plaintiff that he had changed the name of his company from Eurotex to Hisham Ayoub Waterproofing Factory and had become affiliated with a large Saudi Arabian company known as Abdulla Fouad Ltd. Co.

[9] The Agreement granted sole distributorship rights of the RHINO Trademarked Products to Defendant Eurotex in Qatar, the United Arab Emirates, Bahrain, Saudi Arabia, Kuwait, Oman, and Yemen (the "Territory").

educating the Saudi Arabian Customs Officials about the nature of the RHINO Trademarked Products and advising them that there was no means of manufacturing a like product in Saudi Arabia.   As a result of Caston's efforts, Plaintiff received an official reduction in the tariff required for the importation of the RHINO Trademarked Products.  As such, the Saudi Arabia Customs Office assigned a specific identification number to be associated with any importation of the RHINO Trademarked Products.

14. During the term of the Agreement, Plaintiff, primarily through Caston, shared with Defendant H. Ayoub and his companies the confidential and trade secret know-how required to optimize the application of the RHINO Trademarked Products for use in the Territory.   Such know-how included, for example, techniques for applying the RHINO Trademarked Products to the inverted roof systems often found in the Territory.  Additionally, given that civil engineering practices in the Territory differ from those employed in the United States, Plaintiff spent considerable time and effort advising Defendant H. Ayoub and his companies on how to optimize the application to accommodate these practices.  Furthermore, because of the extreme heat in the Territory, Plaintiff developed a chemical formulation tailored for used in the Territory and shared such formulation with Defendant H. Ayoub and his companies.  Plaintiff also provided costing information to Defendant H. Ayoub for use in the project proposal process and to analyze profit margins.

15. During the term of the Agreement, Plaintiff, primarily through Caston, also created and provided to Defendant H. Ayoub and his companies the specifications for each project in the Territory.   Typically, Plaintiff would prepare and conduct the customer presentations and negotiations along with Defendant H. Ayoub.  As such, during the term of the Agreement, Defendant H. Ayoub built up a wealth of proprietary information pertaining to the

identification of customers, customer needs and requirements, market applications, specifications, and other information of a proprietary nature owned by Plaintiff. Furthermore, during the term of the Agreement, Defendants learned from Plaintiff the identity of the sources of raw materials used to produce the RHINO Trademarked Products.

16. While serving as Plaintiff's distributor, Defendants undertook a contractual obligation to secure, for Plaintiff's benefit, protection of Plaintiff's trademark in the Middle East. Defendants, however, breached this duty by obtaining registration of Plaintiff's trademark in Saudi Arabia under the name of H. Ayoub.

17. While serving as Plaintiff's distributor, Defendants undertook a contractual obligation to safeguard the confidential information of Plaintiff's trademark in the Middle East. Defendants, however, breached this duty by obtaining registration of Plaintiff's trademark in Saudi Arabia under the name of H. Ayoub.

18. Plaintiff spent a great deal of money developing its trade secrets and confidential information. Plaintiff reminded Defendant H. Ayoub and his companies that Plaintiff's proprietary trade secrets and confidential information must be maintained as such by Defendants per the Agreement. This confidential and trade secret information provides Plaintiff with a competitive advantage. It constitutes information that is not known outside of Plaintiff's business, and it would be difficult to properly acquire or duplicate this information. Further, this information is known only by those employees of Plaintiff with a need to know. Plaintiff took measures to protect its trade secrets and confidential information, for example, by requiring distributors, such as Defendants, to sign written confidentiality agreements. Plaintiff also limited the distribution of the proprietary formulations to those who needed to know and who were bound by obligations of confidentiality.

19. During the Agreement's term, Defendants purchased inventory from Plaintiff. Plaintiff received Defendants' last order in September 2002.   When this inventory was exhausted, Defendants attempted unsuccessfully to make their own product.  Defendants did not order more RHINO Trademarked Product from Plaintiff prior to the Agreement's May 4, 2003, expiration date.   As such, and for additional reasons, the Agreement, by its own operation, automatically terminated on May 4, 2003.  Upon the Agreement's termination and in accordance with its terms, Defendant Eurotex and its successors agreed to cease use of Plaintiff's IP and not thereafter use any of Plaintiff's IP or anything deceptively similar or substantially identical to it.

20. Despite what the Agreement said, Defendants failed to acquire protection for Plaintiff's IP because they did not file trademark registrations in the Territory on Plaintiff's behalf.   Instead, they obtained such registrations in the name of Defendants H. Ayoub and Rhino SMSI.

21. In early September 2004, after the Agreement's termination, Defendant H. Ayoub, now in the capacity of a regular customer, ordered one tote of RHINO Trademarked Product from Plaintiff.  This product was specially formulated by Plaintiff for use on a particular project of Defendant H. Ayoub.   The product was shipped.   Caston subsequently learned, through his continued contacts at Fouad, that Defendant H. Ayoub planned to use this specially formulated tote of material to prove-out the specifications to the customer and then to switch to another source of product manufactured locally.  Upon learning of this scheme, Plaintiff refused to sell more product to Defendant H. Ayoub and reminded Defendant H. Ayoub of his continuing obligations under the terminated Agreement.   Despite this warning, Defendant H. Ayoub or his companies contacted Plaintiff's raw material suppliers seeking to obtain

information about Plaintiff's product formulations and to have the supplier provide product to Defendants that was made to Plaintiff's proprietary specifications.

22. Plaintiff is using or is using through a related company or licensee the RHINO Trademarks in commerce or in connection with the goods and services identified herein by, for example, selling the sealing product in totes labeled with the RHINO logo and RHINO mark and in other diverse ways customary in the trade.  The RHINO Trademarks have been in continuous use in commerce by Plaintiff and its predecessor companies since September 1994.  There has been no final decision adverse to Plaintiff's claim of ownership of such marks for such goods and services or to Plaintiff's right to register same or keep same on the register.  Additionally, there is no proceeding involving said rights pending and not disposed of either in the United States Patent and Trademark Office ("USPTO") or in the courts.

23. Defendant's name, Rhino SMSI, was derived directly from Plaintiff's use of the words "seamless," "membranes," and "systems" in its marketing literature.

24. Defendants' filing of the SMS Logo United States Trademark Application Serial No. 78/538,862 was fraudulent.

25. On two occasions, separated in time by approximately sixteen (16) months, Defendant Rhino SMSI provided sworn declarations to the USPTO that were knowingly and willfully false when made and which callously disregarded the truth, which is that Plaintiff is the rightful owner of the RHINO Trademarks.

26. After Plaintiff appointed Mohammad Al-Mojil Group ("MMG") as its exclusive applicator, Plaintiff helped MMG create a marketing booklet entitled, "Rhino Membranes and Coatings MMG Pre Qualification Document" (the "RHINO MMG Booklet"), and a brochure entitled, "Rhino Membranes and Coatings Inc. State of the Art Solutions . . . for

SEAMLESS waterproofing, roofing, and corrosion proofing!!!" (the "RHINO MMG Brochure"),
for use in marketing the RHINO Trademarked Products in the Territory.

27. Defendant H. Ayoub admits that the RHINO Trademarks have been well
known in the industry for a long time.

28. Defendant H. Ayoub and his companies are falsely designating the origin of
the RHINO Trademarks as being the Defendants' IP when this is knowingly and willfully false.

29. Defendants' sending of cease and desist letters under the Saudi Arabian
Trademark Registration No. 824/69 (the "Saudi Trademark") was done with the intent to cause
Plaintiff's distributor, MMG, and customers, such as SOMAC Trading & Contracting Est.
("SOMAC"), to stop working with Plaintiff.

30. Defendant Rhino SMSI published, or caused to be published, a marketing
brochure bearing the RHINO mark and the RHINO blue rhinoceros caricature logo and which
was entitled, "Spray Applied Waterproofing System" (the "Rhino SMSI Brochure").

31. Defendants had access to the RHINO Original Works[10] and have copied them,
virtually verbatim, including typographical errors, save and except to change the company name,
in a direct affront to Plaintiff's copyrights in these works.  The Rhino SMSI Brochure was
created by Defendants without any authorization from Plaintiff and represents a knowing and
willful infringement of the copyrights that Plaintiff has in the RHINO Original Works.  The
Rhino SMSI Brochure contains technical testing information and representations about the
RHINO Trademarked Products that were created by Plaintiff yet are being used by Defendants as
if it were their own testing data.  Defendants copied the RHINO Original Works for the specific

---

[10] "The RHINO logo (EXHIBIT A), Rhino MCI Notebook (EXHIBIT G), RHINO Brochure (EXHIBIT
H), derivative work Ayoub/Fouad RHINO Notebooks (EXHIBITS K & L), RHINO MMG Booklet (EXHIBIT P),
and RHINO MMG Brochure (EXHIBIT Q) are collectively referred to as the 'RHINO Original Works.'"  (Am.
Compl., Doc. 35 at ¶ 15).

purpose of infringing Plaintiff's copyrights and using and distributing illegal and unauthorized copies of same to divert business from Plaintiff in the Territory and elsewhere.

32. The content in the Rhino SMSI Brochure is virtually identical to the content in Plaintiff's copyrighted brochures. The blue rhinoceros caricature logo contained in the Rhino SMSI Brochure is identical to the blue rhinoceros caricature logo owned, copyrighted, and trademarked by Plaintiff.

33. After the Agreement's termination, Defendants infringed Plaintiff's copyrights. Defendants have unlawfully used Plaintiff's copyrighted rhino caricature throughout their business, including as a prominent part of their company name, on their rhinosms.com website, in their marketing brochures, on their company letterhead, on the sides of their company vehicles, and as a part of the unauthorized Saudi Trademark. Defendants have also infringed Plaintiff's copyrights in the marketing materials by creating a brochure virtually identical to those covered by Plaintiff's copyrights. Such infringement was willful and entitles Plaintiff to treble the amount of damages. Plaintiff is also entitled to an impoundment of all Defendants' infringing articles.

34. Defendant H. Ayoub has advised Plaintiff's, as well as MMG's, customers that he formerly employed Caston as a "painter" (laborer), and that he fired him "because [Caston] did not know what he was doing." These falsehoods, which Defendant H. Ayoub knew to be false and which were made with the intent to injure Plaintiff, MMG, and Caston, have tarnished the reputations of Plaintiff, MMG, and Caston. Caston was never an employee of Defendants. Rather, during the Agreement's term, he was a Director of Plaintiff Rhino MCI and a consultant for Fouad. Furthermore, Caston was never fired by Defendants. After the

Agreement's termination, Caston formally, voluntarily, and politely withdrew from his position as a consultant for Fouad.

35. Given the Agreement's termination, Defendants are now resorting to a fraudulent misrepresentation that Defendants own all of the exclusive rights in the RHINO Trademarks, RHINO Original Works, RHINO Trademarked Products, and other RHINO IP in the Territory and elsewhere in the world. Defendants make no claim to any continued right as Plaintiff's exclusive distributor, as such right was terminated. Instead, Defendants have now attempted what amounts to a corporate identity theft of Plaintiff Rhino MCI's name, RHINO Trademarks, RHINO Original Works, RHINO Trademarked Products, and RHINO IP and domain name in every conceivable way.

36. The existence of the Saudi Trademark in Defendant H. Ayoub's name and Defendants' threat letters to Plaintiff's then exclusive applicator, MMG, as well as to MMG's customers, have caused harm to Plaintiff's business and contractual relations with MMG in the Territory and have had a chilling effect on MMG's business activities on behalf of Plaintiff in the Territory. MMG expressed directly to Plaintiff its then immediate concern over the confusion Defendants caused in the Territory, as well as its immediate concern of being sued. Additionally, SOMAC's General Manager expressed confusion over who owns the rights to the RHINO Trademarks and RHINO Trademarked Products. Thus, Defendants' activities are causing actual confusion, deception, and mistake in the marketplace regarding the affiliation, connection, or association of Defendants with Plaintiff and Plaintiff's RHINO Trademarks.

37. Defendants are attempting to pass off their products, as if they are Plaintiff's products, in a manner calculated to deceive Plaintiff's customers, its authorized applicators, its authorized applicators' customers, and members of the general public, in that Defendants have,

in wholesale fashion, copied Plaintiff's trademarks, marketing brochures, and products, which are Plaintiff's RHINO Trademarks, RHINO Original Works, and RHINO Trademarked Products.  Additionally, Defendants have fraudulently obtained a Saudi Trademark and filed an application for U.S. Trademark Registration in an effort to make Defendants' products confusingly similar to Plaintiff's. Defendants are intentionally misrepresenting the facts surrounding the source and nature of the goods they sell under the RHINO Trademarks.

38. The sham created by Defendants is also intentionally designed to deceive and defraud the public into believing that Defendants are the original, authentic source of the RHINO Trademarked Products and services, as if Plaintiff never existed.  Defendants have supplied products under the RHINO Trademarks that are inferior in quality and, thereby, serve to derogate and tarnish the goodwill and good name built up by Plaintiff in the RHINO Trademarked Products.

39. Defendant H. Ayoub and his companies have used and continue to use, without authorization, the confidential and proprietary trade secret information belonging to Plaintiff.

40. Plaintiff has invested a great deal of time and money to establish the critical mass of personnel, support staff, inventory, and, most importantly, credibility of the RHINO Trademarked Products in the eyes of its customers.  Specific to the Territory, Plaintiff's Director, Caston, has also expended considerable time, effort, and financial resources to develop the RHINO Trademarked Products in the Territory and to build trust and credibility in these products with customers and prospective customers in the Territory.  These investments were made before and during the Agreement's term and have continued since the Agreement's termination.  Furthermore, MMG has invested considerable sums of money, as well as human and capital

resources, to maintain a substantial local inventory of the authentic RHINO Trademarked Products purchased from Plaintiff, as well as a capital investment in the warehousing, equipment, and personnel required for the distribution and application of the RHINO Trademarked Products in the Territory.

41. Defendants' threats of legal action to MMG and MMG's customers have had a chilling effect on the anticipated business that Plaintiff expected, and it has caused MMG to withdraw as Plaintiff's distributor.

42. On about September 9, 2006, Defendant H. Ayoub met with representatives of the Lootah Group of Companies ("Lootah") located in Dubai, United Arab Emirates, about forming a joint venture with Defendant Rhino SMSI to manufacture, distribute, and apply the RHINO waterproofing technology.   At this meeting, Defendant H. Ayoub discussed waterproofing formulations with Lootah, including asphalt, soap, and latex requirements.  He also provided Lootah with a small square sample of product, as well as one of his business cards bearing the Rhino SMSI name and the RHINO caricature logo.

43. In early October 2006, Mr. Wayne Giles ("Giles") was the Managing Partner of GSP, an authorized agent of MMG and Plaintiff in Bahrain.  During a telephone conversation between Defendant H. Ayoub and Giles on about October 9, 2006, Defendant H. Ayoub represented that he was the owner of the RHINO Trademark and RHINO technology in the Middle East, and that he was handling RHINO-related work for Saudi Basic Industrial Chemical ("SABIC") in Jubail.  He also advised Giles that he would be suing Plaintiff and MMG shortly in Saudi Arabia for use of his trademark.

44. In late November and early December 2006, Defendant H. Ayoub contacted Khalifa Abdukrahman Algosaibi Holding Co. ("Algosaibi") about potentially forming a joint

venture to produce the asphalt latex modified emulsion RHINO products.  He represented to Algosaibi that he had purchased the equipment while with Fouad and that he would sell this equipment to Algosaibi.  He also represented to Algosaibi that the RHINO technology belonged to him and presented Algosaibi with an asphalt emulsion sample and a copy of his Saudi Trademark.

45. In early December 2006, Defendant H. Ayoub represented that he was the authorized agent and true owner of the RHINO technology to CMCI, a company based in Saudi Arabia.

46. On December 25, 2006, Defendants H. Ayoub and M. Ayoub met with Andrew Chan, Vice President – Commercial of MMG, ("Chan") at MMG's offices in Dammam, Saudi Arabia regarding the cease and desist letters directed to Defendants' "RHINO SMS + rhino logo" Saudi Trademark. During this meeting, Defendant H. Ayoub represented to Chan that the Agreement was still valid and in force.  He asserted that he is the rightful originator and owner of the RHINO trademark, products, and technology in Saudi Arabia.  Defendant H. Ayoub advised Chan that he intended on pursuing legal action against MMG under the Saudi Trademark.  Additionally, he alleged that the poor quality of MMG's RHINO product and workmanship was causing damage to the Saudi Trademark.  With regard to this allegation, he specifically asserted that the RHINO product applied by MMG at the Saline Water Conversion Company ("SWCC") plant had failed.

47. On January 23, 2007, Mr. Eddy Yeah ("Yeah"), an employee who reports to Caston, personally witnessed a roofing crew of Defendant Rhino SMSI working at one of the Khalifa building properties, specifically, the Namma Cargo warehouse.  This roofing job was supposed to have been awarded to MMG.  Additionally, Yeah personally witnessed a white

Isuzu truck and a white double cabin Chevrolet pickup truck parked side by side.  Both vehicles had labels on their doors displaying the Saudi Trademark and the blue rhinoceros caricature logo along with an indication in English that the company has locations in "U.S.A. – Saudi Arabia – Bahrain" with the telephone number "Tel: 03 867 8282."  Yeah took four digital photos of these vehicles.

48. Shortly before trial, Plaintiff discovered the existence of another variation of Defendants' infringing brochure of Plaintiff's Trial Exhibit X.  This newly discovered marketing brochure is entitled, "Waterproofing Applications," and is written chiefly in Arabic.

49. The "Waterproofing Applications" marketing brochure is virtually identical to, strikingly similar to, and substantially similar to Plaintiff's U.S. Copyright Registration No. TX 6-405-320 dated June 19, 2005, for the Rhino MCI marketing brochure entitled, "Rhino Membranes and Coatings Inc. State of the Art Solutions . . . for SEAMLESS waterproofing, roofing, and corrosion proofing!!!"

50. The "Waterproofing Applications" marketing brochure is virtually identical to, strikingly similar to, and substantially similar to Plaintiff's U.S. Copyright Registration No. TX 6-405-321 dated June 19, 2005, for the Rhino MCI/MMG marketing brochure entitled, "Rhino Membranes and Coatings Inc. State of the Art Solutions . . . for SEAMLESS waterproofing, roofing, and corrosion proofing!!!"

51. The "Waterproofing Applications" marketing brochure is virtually identical to, strikingly similar to, and substantially similar to Plaintiff's U.S. Copyright Registration No. TX 6-410-907 dated June 19, 2005, for the Rhino MCI/MMG marketing brochure entitled, "Rhino Membranes and Coatings MMG Pre Qualification Document."

52. The "Waterproofing Applications" marketing brochure is virtually identical to, strikingly similar to, and substantially similar to Plaintiff's U.S. Copyright Registration No. TX 6-405-319 dated June 19, 2005, for the marketing notebook entitled, "Rhino International Waterproofing Membrane System."

53. Defendants published or caused to be published the "Waterproofing Applications" marketing brochure.

54. The "Waterproofing Applications" marketing brochure was created by Defendants and distributed in Syria.

55. Due to Defendants' continued assertion of their wrongfully-obtained Saudi Trademark against Plaintiff's Middle Eastern business relations, including MMG, MMG withdrew as Plaintiff's distributor in the Territory.  Subsequent to the entry of this Court's February 22, 2007, Order of Civil Contempt, Plaintiff learned that Defendant H. Ayoub had instituted a legal action in Saudi Arabia before the Saudi Board of Grievances (Case No. 1254/3/Q/1427) (the "Saudi Action") against Plaintiff and MMG regarding Defendants' Saudi Trademark.  By official letter from the Saudi Board of Grievances, MMG was required to appear for a hearing before the Saudi Board of Grievances on June 5, 2007, in the Saudi action. Representatives of MMG attended this hearing on June 5, 2007, along with Defendant H. Ayoub. Since MMG had already withdrawn as Plaintiff's distributor, Defendants dismissed the Saudi action on about June 5, 2007.

56. Defendants have willfully infringed the copyrights of Plaintiff Rhino MCI.

57. Defendants have willfully infringed the trademarks of Plaintiff Rhino MCI.

58. Defendants have misappropriated trade secrets from Plaintiff Rhino MCI, have breached a confidential or trust relationship with Plaintiff, have breached the IP terms of the Agreement, and have competed unfairly with Plaintiff.

59. Defendants have fraudulently obtained the Saudi Trademark, and Defendants have no rights in the Saudi Trademark.

60. Unless enjoined by this Court, Defendants intend to continue their course of conduct and wrongfully use, infringe upon, sell, and otherwise profit from Plaintiff's RHINO Original Works, RHINO Trademarks, and works derived therefrom.  As a direct and proximate result of the acts of Defendants, Plaintiff has already suffered irreparable financial damage and has sustained lost profits.  Plaintiff has no adequate remedy at law to redress all of the injuries that Defendants have caused and intend to cause by their conduct.  Plaintiff will continue to suffer irreparable damage and sustain lost profits until Defendants' actions are permanently enjoined by this Court.

61. Plaintiff Rhino MCI is entitled to an award of monetary damages and reasonable attorney's fees suffered by Plaintiff as a result of Defendants' unlawful actions.

62. This case is exceptional.  Defendants' conduct has been willful and malicious and has caused injury to Plaintiff Rhino MCI and its distributors.  Damages assessed against Defendants should be trebled.

63. Contrary to Defendants' assertions in their "Status Report" that they could not pay the contempt award, at about the time of the filing of such Status Report, Defendants had significant assets available to use toward satisfying the award of contempt.

## *CONCLUSIONS OF LAW*

1.    Plaintiff Rhino MCI is entitled to relief under the Lanham Trademark Act of 1946, 15 U.S.C. § 1051 *et seq.*, particularly 15 U.S.C. §§ 1114, 1116, 1117, 1125(a), and 1125(d), for false designation of origin, false or misleading descriptions and representations of fact, and dilution based on Defendants' wrongful appropriation and use of Plaintiff's RHINO Trademarks and the bad faith, illegal registration, trafficking in, and use of a domain name that incorporates Plaintiff's RHINO Trademarks.

2.    Plaintiff owns all right, title, and interest in and to its trademarks, including, U.S. Trademark Registration No. 2,606,268 and U.S. Trademark Registration No. 3,145,629.

3.    U.S. Trademark Registration No. 2,606,268 enjoys the statutory status of being "incontestable" in view of the fact that the Section 8 & 15 Affidavits were timely filed and accepted by the USPTO.   *See* 15 U.S.C. §§ 1058, 1065 and Pl.'s Trial Ex. Z-17.   Section 15 provides, in pertinent part, that a trademark owner's right to use the registered mark for the goods and/or services registered shall be incontestable where such registered mark was in use "in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce."  15 U.S.C. § 1065.  Plaintiff met this requirement as either it or its predecessor has used this mark in commerce for five consecutive years, since August 13, 2002. Furthermore, "there has been no final decision adverse to registrant's claim of ownership of such mark for such goods or services, or to registrant's right to register the same or to keep the same on the register," and "there is no proceeding involving said rights pending in the Patent and Trademark Office or in a court and not finally disposed of."  *Id.*

4.   The Court notes that, had Plaintiff's prior U.S. Trademark Registration No. 2,044,513, dated March 11, 1997, not been cancelled due to inadvertence, it too would enjoy the statutory status of incontestability.  This registration has since been replaced by U.S. Trademark Registration No. 3,145,629, dated September 19, 2006.  In any event, Plaintiff's rights in both of these marks were established in 1994 and have never been abandoned by Plaintiff or its predecessor.

5.   Defendants have infringed Plaintiff's U.S. Trademark Registration No. 2,606,268 and U.S. Trademark Registration No. 3,145,629.  *See* 15 U.S.C. § 1114(1).  One need only look for a moment to conclude that Defendants' mark is a "counterfeit mark," as defined, because it is "a counterfeit of a mark that is registered on the principal register in the [USPTO] for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered."   15 U.S.C. § 1116(d)(1)(B)(i).  A "counterfeit" is "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark."  15 U.S.C. § 1127.

6.   The Plaintiff's federally protected trademark rights, claiming dates of first use back to 1994, include the following registered marks:

a.      (*see* Pl.'s Trial Ex. 2), and

b.   (*see* Pl.'s Trial Ex. 3).

Defendant's mark is virtually identical to, and incorporates both of Plaintiff's registered marks:



Similarly, Defendants' use of the mark "RHINO" is virtually identical to Plaintiff's above-registered RHINO mark.  Defendants' use of the rhino caricature, particularly in a blue color, is

identical with that of Plaintiff's U.S. Trademark Registration No. 3,145,629.   Defendant's prominent use of the word RHINO, alone or in combination with the blue rhino is "a reproduction, counterfeit, copy or colorable imitation" of Plaintiff's U.S. Trademark Registration No. 2,606,268.   The evidence establishes that Defendants have used these marks in connection with the sale, offering for sale, distribution, or advertising of virtually identical goods and services to those of Plaintiff.   As such, Defendants' use is likely to cause confusion (and has, in fact, caused confusion) or mistake or to deceive.   The evidence establishes that Defendants have applied these reproduction, counterfeit, copy, or colorable imitation marks to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services that are virtually identical to those of Plaintiff.   As such, Defendants' use in this manner is again likely to cause confusion (and has, in fact, caused confusion), cause mistake, or to deceive. Based on the foregoing, Defendants are liable under 15 U.S.C. § 1114(1).

> 7.   As this Court concluded in an earlier Memorandum Opinion and Order:
>
> Where, as here, the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself.  *Interpace Corp.* v. *Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir. 1983).   Rather, the court must examine the registered mark, determine whether it is inherently distinctive, and compare it against the challenged mark.  *Id.*   Here, Rhino has shown that the mark used by Defendants is not only similar, but identical to its own.  *See* [Pl.'s] Exhibits A, B, C, F, K, L, P, Q, R, S, T, X, and Y.

(Doc. 27 at 5).   This conclusion was further supported by the clear and convincing evidence subsequently introduced supporting this Court's entry of an Order of Contempt.   (Doc. 64). Additionally, a USPTO Examining Attorney has concluded that, under the two-part analysis for determining the likelihood of confusion, Defendants' RHINO SMS + rhino caricature logo so resembles Plaintiff's Trademark Registration No. 2,606,268, as to be likely to cause confusion or

mistake or to deceive.  *See* Pl.'s Trial Ex. 4.  The Court finds the analysis conducted by the

USPTO Examining Attorney to be persuasive and, as such, hereby adopts it.  *See e.g., D.M.*

*Antique Import Corp. v. Royal Saxe Corp.*, 311 F. Supp. 1261, 1274 (S.D.N.Y. 1969) (Even an

*ex parte* USPTO determination is entitled to great deference because of the recognized "expertise

of the trademark examiners").   The Court notes that, in this case, the USPTO Examiner's

determination was not even *ex parte* as to Defendants Rhino SMS and H. Ayoub since this was

their application.  *See also Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359-

60 (Fed. Cir. 1984) (finding, as to evidence reviewed by a patent examiner, the USPTO is due

the deference of a qualified government agency presumed to have properly done its job);

*Mechanical Plastics v. Tital Technologies*, 823 F. Supp. 1137, 1149 (S.D.N.Y. 1993) (holding

that courts should show deference to the factual findings of USPTO trademark examiners) (citing

*Goya Foods, Inc. v. Tropicana Prods., Inc.,* 846 F.2d 848, 852-53 (2d Cir. 1988)).

       8.   As is supported by the facts of this case, Defendants' infringement has been

willful, and Defendants are jointly and severally liable for damages caused by their infringement.

       9.   Defendants' actions, as supported by the evidence, also constitute violations

of Sections 43(a) and 43(d) of the Lanham Act, specifically, 15 U.S.C. § 1125(a) and 1125(d).

       10.   Defendants, in connection with their offering, attempting to offer, and selling

of these spray-applied products with Plaintiff Rhino MCI's RHINO Trademarks in commerce,

including through their website, have caused confusion, and will continue to likely cause

confusion or mistake or to deceive as to the affiliation, connection, or association of Defendants

with Plaintiff Rhino MCI.  Similarly, Defendants' unauthorized use of Plaintiff's registered and

common law trademarks on the RHINO Original Works and of the SMSI Brochure constitutes

commercial advertising or promotion that misrepresents the nature, characteristics, qualities, or

geographic origin of theirs or another person's goods, services, or commercial activities.  In addition, Defendants, in connection with their offering of such spray-on products under Plaintiff's RHINO Trademarks, are misrepresenting the origin, sponsorship, or approval of their goods, services, and commercial activities as being associated or affiliated with Plaintiff.  As a result, Defendants have violated 15 U.S.C. § 1125(a).

11.  Defendants have also engaged in cyberpiracy.  *See* 15 U.S.C. § 1125(d).  It is undisputed that Plaintiff established its use, in commerce, of the RHINO Trademarks back as early as 1994.  It is also undisputed that Defendants were not involved in the spray-on asphalt emulsion lining market prior to becoming an authorized distributor of Plaintiff in 1998.  Furthermore, it is undisputed that Plaintiff established its current rhinomembranes.com domain name on September 20, 2004, and that Defendants later established their rhinosms.com domain name on December 19, 2004.  The date on which Defendants established their rhinosms.com domain name was proximate to Defendants' creation, on December 27, 2004, of the eurotexint.com domain name, and it was shortly after they received Plaintiff's cease and desist letters.  *See* Pl.'s Trial Ex. M and N.  Defendants' use of Plaintiff's registered rhino mark as the dominant part of their domain name rhinosms.com was done with bad faith intent to profit from Plaintiff's registered rhino mark.   This bad faith is evidenced by the unlawful conduct complained of in this suit, as well as other factors.  For example, Defendants did not originate the use of the rhino mark in connection with their goods and services or in connection with the creation of their rhinosms.com domain name because the rhino name used in their domain name is derived directly from the Plaintiff's name, registered trademarks, and domain name.  Defendants were well aware of Plaintiff's prior use of the rhino mark preceding the creation of their rhinosms.com domain name.  Defendants clearly established the rhinosms.com website to

promote their commercial activities in direct competition with Plaintiff.  Thus, Defendants have

no ability to assert their use of this domain name is somehow non-commercial or "fair use."

Based on the evidence, Defendants' bad faith intent is also established by their use of this

domain name to divert customers away from Plaintiff and to make it appear that they are in fact

the Plaintiff, sponsored by the Plaintiff, or otherwise creating confusion as to the source of goods

and services emanating from the rhino mark.  Defendants have no reasonable grounds to believe

that the use of the rhinosms.com domain name was a fair use or otherwise lawful.  As such,

Defendants commercial use of the rhinosms.com domain name and website to traffic in business

competitive with that of Plaintiff, via use of a domain name incorporating Plaintiff's registered

trademark, constitutes cyberpiracy.

      12. Pursuant to 15 U.S.C. § 1117(a), Defendants' violations of Plaintiff's U.S.

trademark registrations, violations of 15 U.S.C. § 1125(a) or (d), and willful violations under 15

U.S.C. § 1125(c) entitle Plaintiff, subject to the principles of equity, to recover:

> (1) defendant's profits, (2) any damages sustained by the plaintiff,
> and (3) the costs of the action. The court shall assess such profits
> and damages or cause the same to be assessed under its direction.
> In assessing profits the plaintiff shall be required to prove
> defendant's sales only; defendant must prove all elements of cost
> or deduction claimed. In assessing damages the court may enter
> judgment, according to the circumstances of the case, for any sum
> above the amount found as actual damages, not exceeding three
> times such amount. If the court shall find that the amount of the
> recovery based on profits is either inadequate or excessive the
> court may in its discretion enter judgment for such sum as the court
> shall find to be just, according to the circumstances of the case.
> Such sum in either of the above circumstances shall constitute
> compensation and not a penalty. The court in exceptional cases
> may award reasonable attorney fees to the prevailing party.

15 U.S.C. § 1117(a).

      13.  Pursuant to 15 U.S.C. § 1117(b):

> In assessing damages under subsection (a) of this section, the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever is greater, together with a reasonable attorney's fee, in the case of any violation of section 1114(1)(a) of this title or section 220506 of Title 36 that consists of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 1116(d) of this title), in connection with the sale, offering for sale, or distribution of goods or services. In such cases, the court may in its discretion award prejudgment interest on such amount at an annual interest rate established under section 6621(a)(2) of Title 26, commencing on the date of the service of the claimant's pleadings setting forth the claim for such entry and ending on the date such entry is made, or for such shorter time as the court deems appropriate.

15 U.S.C. § 1117(b).  Although the statute does not define "extenuating circumstances," the legislative history to this section indicates that "it will be a rare case in which a defendant who has trafficked in goods or services using a mark that he or she knows to be counterfeit can show that he or she should not be assessed treble damages."   Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. H12076 at 12083 (Oct. 10, 1984).

14.  Because Defendants have used a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services,

> [P]laintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under subsection (a) of this section, an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of--
>
> (1) not less than $500 or more than $100,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or
>
> (2) if the court finds that the use of the counterfeit mark was willful, not more than $1,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

15 U.S.C. § 1117(c).

15. Additionally, "[i]n a case involving a violation of section 1125(d)(1) of this title, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just. 15 U.S.C. § 1117(d).

16. With respect to violations referred to in section 1117, "it shall be a rebuttable presumption that the violator is willful for purposes of determining relief if the violator, or a person acting in concert with the violator, knowingly provided or knowingly caused to be provided materially false contact information to a domain name registrar, domain name registry, or other domain name registration authority in registering, maintaining, or renewing a domain name used in connection with the violation. Nothing in this subsection limits what may be considered a willful violation under this section."  15 U.S.C. § 1117(e).

17. Additionally, this Court "shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title."  15 U.S.C. § 1116(a).

18. As set out above, Defendants, in connection with their offering, attempting to offer, and selling of these spray-applied products and related services with Plaintiff Rhino MCI's RHINO Trademarks in commerce, including through their website, have caused confusion, and will continue to likely cause confusion or mistake or to deceive as to the affiliation, connection or association of Defendants with Plaintiff Rhino MCI.

19.  To maintain a copyright infringement claim under the U.S. Copyright Act, 17 U.S.C. § 101 *et seq.*, the copyright owner must have registered the copyrighted work.  *See* 17 U.S.C. § 411(a).

20.  Plaintiff has five U.S. Copyright Registrations for the RHINO Original Works made the subject of this suit.  They are as follows:

a.   VA 1-375-178, dated June 19, 2006, for the Blue Rhinoceros Caricature (*see* Pl.'s Trial Ex. A and A-1);

b.  TX 6-405-320, dated June 19, 2005, for the Rhino MCI marketing brochure entitled, "Rhino Membranes and Coatings Inc. State of the Art Solutions . . . for SEAMLESS waterproofing, roofing, and corrosion proofing !!!" (*see* Pl.'s Trial Ex. H and H-1);

c.  TX 6-405-321, dated June 19, 2005, for the Rhino MCI / MMG marketing brochure entitled, "Rhino Membranes and Coatings Inc. State of the Art Solutions . . . for SEAMLESS waterproofing, roofing, and corrosion proofing !!!" (*see* Pl.'s Trial Ex. Q and Q-1);

d.  TX 6-410-907, dated June 19, 2005, for the Rhino MCI / MMG marketing brochure entitled, "Rhino Membranes and Coatings MMG Pre Qualification Document" (*see* Pl.'s Trial Ex. P and P-1); and

e.  TX 6-405-319, dated June 19, 2005, for the marketing notebook entitled, "Rhino International Waterproofing Membrane System" (*see* Pl.'s Trial Ex. K and K-1).

21.  A copyright infringement action requires the plaintiff to show "ownership" of the work and "copying" of the work by the defendants.  *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991) (citing *Apple Barrel Productions, Inc. v. Beard*, 730 F.2d 384, 387 (5th Cir. 1984)).  To establish "ownership" of the work, Plaintiff Rhino MCI must show that the RHINO Original Works are original, can be copyrighted, and that Plaintiff has complied with all statutory formalities under the Copyright Act.  *Id.*  All statutory formalities have been met.  The

applications, deposits, and fee were received by the U.S. Copyright Office on June 19, 2006, and

the works have received their certificates of registration.  (*See* Pl.'s Trial Ex. A, H, K, P, Q, and

Z-4).  Additionally, Plaintiff received U.S. Copyright Registration Certificates for each of these

applications.   (*See* Pl.'s Trial Ex. A-1, H-1, K-1, P-1, and Q-1).   These five Copyright

Registration Certificates constitute *prima facie* evidence of the validity of these copyrights.  17

U.S.C § 410(c).  "The Certificate of Copyright Registration introduced at the hearing constitutes

prima facie evidence of the validity of the copyright . . . and its ownership."  *Universal City*

*Studios, Inc., v. Kamar Industries, Inc.*, 217 U.S.P.Q. 1162, 1166 (S.D. Tex. 1982) (citing

*Murray v. Gelderman*, 566 F.2d 1307 (5th Cir. 1978); 17 U.S.C. § 410(c)).  "Copying" is shown

by proof of access to the copyrighted material and substantial similarity between the two works.

*Apple Barrel Productions*, 730 F.2d at 387, n.3 (citing *Miller v. Universal Studios, Inc.*, 650 F.2d

1365, 1375 (5th Cir. 1981)).  As the Fifth Circuit has stated:

> Two separate components underlie proof of actionable copying.
> First is the factual question whether the alleged infringer actually
> used the copyrighted material to create his own work. Copying as a
> factual matter typically may be inferred from proof of access to the
> copyrighted work and "probative similarity."  Not all copying,
> however, is copyright infringement.  The second and usually more
> difficult question is whether the copying is legally actionable. This
> requires a court to determine whether there is substantial similarity
> between the two works.

*Engineering Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340-41 (5th Cir. 1994)

(citations and footnotes omitted).  *See also Straus v. DVC Worldwide, Inc.*, 484 F. Supp. 2d 620,

635-36 (S.D. Tex. 2007).

22.  During the course of the Agreement, Defendants, through H. Ayoub and M.

Ayoub, dealt directly with Plaintiff and Plaintiff's representative, Caston, and were provided

with access to the RHINO Original Works made the subject of the above-referenced U.S.

Copyright Registrations.   Since the beginning of the distributorship relationship, Defendants

were also aware of Plaintiff's use of the blue rhino caricature as a trademark.  Likewise, Defendants had direct access to the manuals and notebooks made the subject of the above-referenced U.S. Copyright Registrations, as some of them were actually created for Defendants' use as part of the Agreement.  However, after the Agreement's termination, Defendants directly and factually copied the blue rhino logo verbatim and created a marketing brochure that is virtually identical to that of the Plaintiff's registered works.  (*See* Pl.'s Trial Ex. X).  Defendants did not independently create their logo or brochure; they copied it from Plaintiff.

23.  Defendants stipulate that they had access to the material made the subject of each of Plaintiff's registered copyrights and that their marketing brochures and other uses of the rhino caricature are identical to, strikingly similar to, and substantially similar to the material made the subject of Plaintiff's U.S. Copyright Registrations.  (Doc. 59, Admissions of Fact ¶ 16-18, 25, 36-38, 45, 56-65 and Agreed Propositions of Law ¶ 5-6).  Based on these stipulated to facts and propositions of law, Defendants have infringed each of Plaintiff's registered copyrights in numerous ways.

24.  The blue rhino caricature depicted in the logo below



was used by Defendants, without Plaintiff's authorization, in Defendants' rhinosms.com website, Defendants' letterhead, letter headers, vehicles, U.S. Trademark Application, Saudi Trademark Application, Saudi Trademark Registration, invoices, business cards, and brochures.  The blue rhino caricature used by Defendants is identical to, strikingly similar to, and substantially similar to Plaintiff's rhino caricature made the subject of U.S. Copyright Registration No. VA 1-375-178 (Pl.'s Trial Ex. A and A-1).  It is a direct copy of the protected content.  As such, Defendants have infringed Plaintiff's U.S. Copyright Registration No. VA 1-375-178 in multiple ways and in

at least ten different end products.

25.  Defendants' marketing brochure (Pl.'s Trial Ex. X) infringes Plaintiff's U.S. Copyright Registration No. TX 6-405-320, dated June 19, 2005, for the Rhino MCI marketing brochure entitled, "Rhino Membranes and Coatings Inc. State of the Art Solutions . . . for SEAMLESS waterproofing, roofing, and corrosion proofing !!!" (Pl.'s Trial Ex. H and H-1).

26.  Defendants' marketing brochure (Pl.'s Trial Ex. X) infringes Plaintiff's U.S. Copyright Registration No. TX 6-405-321, dated June 19, 2005, for the Rhino MCI / MMG marketing brochure entitled, "Rhino Membranes and Coatings Inc. State of the Art Solutions . . . for SEAMLESS waterproofing, roofing, and corrosion proofing !!!" (Pl.'s Trial Ex. Q and Q-1).

27.  Defendants' marketing brochure (Pl.'s Trial Ex. X) infringes Plaintiff's U.S. Copyright Registration No. TX 6-410-907, dated June 19, 2005, for the Rhino MCI / MMG marketing brochure entitled, "Rhino Membranes and Coatings MMG Pre Qualification Document" (Pl.'s Trial Ex. P and P-1).

28.  Defendants' marketing brochure (Pl.'s Trial Ex. X) infringes Plaintiff's U.S. Copyright Registration No. TX 6-405-319, dated June 19, 2005, for the marketing notebook entitled, "Rhino International Waterproofing Membrane System" (Pl.'s Trial Ex. K and K-1).

29.  For the same reasons as set forth above, Defendants' marketing brochure (Pl.'s Trial Ex. Z-29) also infringes these four registered copyrights.

30.  Defendants' copyright infringement has been willful and deliberate.

31.  The U.S. Copyright Act provides that, "[e]xcept as otherwise provided by this title, an infringer of copyright is liable for either (1) the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or (2) statutory damages, as provided by subsection (c)."  17 U.S.C. § 504(a).

32. Additionally, the court may, in its discretion, "allow the recovery of full costs by or against any party other than the United States or an officer thereof.  Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs."  17 U.S.C. § 505.

33. Under Texas law,

> [a] person may bring an action to enjoin an act likely to injure a business reputation or to dilute the distinctive quality of a mark registered under this chapter or Title 15, U.S.C., or a mark or trade name valid at common law, regardless of whether there is competition between the parties or confusion as to the source of goods or services.  An injunction sought under this section shall be obtained pursuant to Rule 680 et seq. of the Texas Rules of Civil Procedure.

Tex. Bus. & Com. Code § 16.29.

34. Plaintiff Rhino MCI, by its adoption and use of the RHINO Trademarks in this District and elsewhere, has acquired common law rights in the RHINO Trademarks.  For example, Plaintiff has established and maintains common law rights in its trademarks, including the logo found below, which combines both of its trademarks registered under Title 15, U.S.C.



35. The Court notes that, even during the time period in which Plaintiff's prior U.S. Trademark Registration No. 2,044,513 to the rhino caricature lapsed, December 13, 2003, to September 19, 2006, Plaintiff maintained superior common law rights in the rhino caricature as a trademark for the goods and services provided by Plaintiff.

36. Defendants have unlawfully appropriated and used Plaintiff's RHINO Trademarks at common law without the right or permission to do so from Plaintiff.

37. Defendants have appropriated, for their own use with similar goods, services and commercial activities, a virtually identical trademark to that of Plaintiff. Such illegal use has already caused confusion and will continue to likely cause confusion. Plaintiff's RHINO Trademarks are strong, arbitrary marks and, as such, are entitled to significant protection. Defendants are contacting the same customers as Plaintiff, and are seeking to offer, sell, and distribute their infringing goods, services, and commercial activities within the same stream of commerce Plaintiff uses. Defendants have not used one shred of originality in their advertising or business activities but, instead, have relied on the wholesale copying of all aspects of Plaintiff's business. Defendants' actions have been willful and wanton, and they were carried out with an express intent to injure Plaintiff's business.

38. Plaintiff is entitled to a permanent injunction enjoining Defendants from continuing to use the RHINO Trademarks or confusingly similar names, marks, or trade dress for marketing, manufacturing, and/or selling spray-on products and related services of the type described herein.

39. Plaintiff is entitled to an award of its actual damages resulting from Defendants' illegal conduct. Due to the brazen, willful, and wanton nature of Defendants' conduct, Plaintiff is also entitled to an award of enhanced damages.

40. In order to succeed on a claim for trade secret misappropriation under Texas law, a plaintiff must: "(1) establish that a trade secret existed; (2) demonstrate that the trade secret was acquired by the defendant through a breach of a confidential relationship or discovered by improper means; and (3) show that the defendant used the trade secret without authorization from the plaintiff." *Gen. Univ. Sys. v. Lee*, 379 F.3d 131, 149-50 (5th Cir. 2004) (footnote omitted).

41. In order to determine whether there is a trade secret protected from disclosure or use, the court must examine six relevant, but nonexclusive, criteria.  They are as follows:

a.   the extent to which the information is known outside the business;

b.   the extent to which it is known by employees and others involved in the business;

c.   the extent of measures taken to safeguard the secrecy of the information;

d.   the value of the information to him and to his competitors;

e.   the amount of effort or money expended in developing the information; and

f.   the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (citing *In re Bass*, 113 S.W.3d 735, 739-40 (Tex. 2003)).  In *Bass*, the court expressly held that "the party claiming a trade secret should not be required to satisfy all six factors because trade secrets do not fit neatly into each factor every time."  *Bass*, 113 S.W.3d at 740.

42. Additionally, a cause of action for misappropriation of intellectual property under Texas law was implicitly recognized in *Capital Films Corp. v. Charles Fries Productions*, 628 F.2d 387 (5th Cir. 1980).  "The three elements of misappropriation listed by the district court were (1) the idea is novel; (2) disclosure of the idea was made in confidence; and (3) the idea was adopted and made use of by the defendant."  *Apple Barrel Productions*, 730 F.2d at 389 (citing *Capital Films Corp.*, 628 F.2d at 394).

43. In an action for trade secret misappropriation, the plaintiff can recover actual damages based on the value of what has been lost by the plaintiff or the value of what has been gained by the defendant.  *See Carbo Ceramics, Inc. v. Keefe*, 166 Fed. Appx. 714, 722-23 (5th

Cir. 2006) (citing *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535-36 (5th Cir. 1974) (footnote omitted)).

44. As set out in the Findings of Fact, Plaintiff Rhino MCI has, at all relevant times, maintained trade secret and confidential information regarding, for example, its spray-on coating technologies, applications, and customer details.  This information provides Plaintiff with a competitive advantage.

45. Defendants learned of these trade secrets and confidential information directly from Plaintiff Rhino MCI under written obligations of confidentiality, which were set forth in the Agreement.  Defendant H. Ayoub has shared such trade secrets and confidential information with others, including his brother Defendant M. Ayoub.

46. Subsequent to the Agreement's termination, Defendants used and disclosed these trade secrets and confidential information without Plaintiff's authorization.

47. Defendants' unlawful and unauthorized use and disclosure of Plaintiff's trade secrets and confidential information has been willful and deliberate.

48. As a result of Defendants' unlawful and unauthorized use and disclosure of Plaintiff's trade secrets and confidential information, Plaintiff has suffered actual damages.

49. Additionally, as a result of the willful and deliberate nature of Defendants' unlawful activities, Plaintiff is entitled to exemplary damages.

50. Defendants' unlawful theft and misappropriation of Plaintiff's trade secrets and confidential information have caused Plaintiff irreparable harm for which there is no adequate remedy at law and will continue to cause Plaintiff irreparable harm unless Defendants are permanently enjoined by the Court.  Accordingly, Plaintiff is entitled to a permanent injunction against Defendants.

51. Under the Texas Theft Liability Act, "a person who commits theft is liable for the damages resulting from the theft." Tex. Civ. Prac. & Rem. Code § 134.003(a). Under this Act, "person" means "an individual, partnership, corporation, association, or other group, however organized," and "theft" means "unlawfully appropriating property or unlawfully obtaining services[.]" *Id.* at § 134.002. "[A] person who has sustained damages resulting from theft may recover: (1) under Section 134.003(a), from a person who commits theft, the amount of actual damages found by the trier of fact and, in addition to actual damages, damages awarded by the trier of fact in a sum not to exceed $1,000[.]" *Id.* at § 134.005(a)(1). Additionally, the prevailing party is entitled to an award of its court costs and reasonable and necessary attorney's fees. *Id.* at § 134.005(b). *See Avanti Sales Intern., Inc. v. Pycosa Chemicals, Inc.*, 01-04-00983-CV, 2005 WL 2670740, *3 (Tex. App.—Houston [1st Dist.] 2005) (applies Texas Theft Liability Act to unlawful appropriation or communication of trade secrets).

52. Defendants unlawfully appropriated Plaintiff's property by stealing trade secrets or communicating same to a third party. As such, and in accordance with Tex. Civ. Prac. & Rem. Code §§ 134.001-.005, Plaintiff Rhino MCI is entitled to damages, injunctive relief, and an award of its reasonable and necessary attorney's fees.

53. A plaintiff must prove each of the following to establish a claim for conversion:

a. the plaintiff owned or had possession of the property or entitlement to possession;

b. the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner;

c. the plaintiff demanded return of the property; and

d. the defendant refused to return the property.

*Burns v. Rochon*, 190 S.W.3d 263, 268 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (citing *Apple Imports, Inc. v. Koole,* 945 S.W.2d 895, 899 (Tex. App.—Austin 1997, writ denied)).  *See also Avanti Sales Intern.*, 2005 WL 2670740, at *4 (determining whether defendants wrongfully exercised dominion and control over trade secrets is synonymous with determining whether the alleged misappropriation is the "wrongful" conduct claimed of by plaintiff).

54. Unlike theft, the common law tort of conversion does not require proof of wrongful intent.  *See Schwartz v. Pinnacle Comm'ns*, 944 S.W.2d 427, 432-33 (Tex. App.—Houston [14th Dist.] 1997, no writ).

55. Defendants unlawfully exercised dominion and control over Plaintiff's RHINO Trademarks, RHINO Trademarked Products, RHINO Original Works, RHINO IP and trade secrets, in denial of, or inconsistent with, Plaintiff's rights in that property.  As such, Plaintiff is entitled to damages, injunctive relief, and an award of its attorney's fees.

56. The elements of tortious interference with a contract are as follows:

    a.  the existence of a contract subject to interference;

    b.  willful and intentional interference;

    c.  interference that proximately caused damage; and

    d.  actual damage or loss.

*Powell Indus., Inc. v. Allen*, 985 S.W.2d 455, 456 (Tex. 1998) (citing *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997)).  "[T]o recover on a claim for tortious interference with a prospective business relationship, the plaintiff must establish the defendant's conduct is independently tortious."  *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 858 (Tex. App.—Houston [14th Dist.] 2001, no writ) (citing *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001)).  "[I]t is not necessary for the plaintiff to prove an independent tort, only

that the plaintiff establish the defendant's conduct would be actionable under a recognized tort." *Id.* (citing *Sturges*, 52 S.W.3d at 726).

57. Based on the Findings of Fact in this matter, Plaintiff Rhino MCI has spent considerable funds in developing the goodwill associated with its RHINO Trademarked Products with its customers, as well as with its distributors or applicators and their respective customers. Defendants have directly interfered with the business and contractual relationship between Plaintiff and MMG, its applicator in the Territory. Additionally, Defendants have interfered directly with Plaintiff's existing and prospective customers, including those of its distributors and applicators. Defendants' interference is ongoing and will continue to take place unless it is permanently enjoined. Defendants have interfered with Plaintiff's relationship with MMG, its exclusive applicator in the Territory, as well as with other customers of Plaintiff and MMG and, in doing so, have put at risk the investment and profit potential opportunity of the agreements and business relationships.

58. By copying Plaintiff Rhino MCI's RHINO Trademarks, RHINO Original Works, and RHINO IP, Defendants seek to trade upon the opportunity without being bound by the Agreement.

59. Additionally, Defendants' interference with Plaintiff's distributor, MMG, caused Plaintiff to lose income on prospective job orders and ultimately to lose MMG as its distributor. Defendants' unlawful interference has jeopardized the potential for this business, perhaps irreversibly. Defendants' activities have been intentional and malicious in their manner of intervening into the existing or prospective business relationships of Plaintiff and MMG. Defendants have no legal justification for such interference. As a consequence of such interference, Plaintiff has suffered actual damages, harm or loss.

60. Based on the Findings of Fact in this matter, Defendants have engaged in conduct which constitutes fraud.  The elements of fraud are as follows:

    a.   that a material representation was made;

    b.   the representation was false;

    c.   when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion;

    d.   the speaker made the representation with the intent that the other party should act upon it;

    e.   the party acted in reliance on the representation; and

    f.   the party thereby suffered injury.

*In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001) (citing *Formosa Plastics Corp. v. Presidio Engrs. & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998)).  Defendants have made material representations that they are the rightful owners of the RHINO Trademarks to Plaintiff's customers and distributor, as well as the USPTO, under oath, and the Saudi Arabian Trademark Office.  These representations are false, and, when Defendants made them, they either knew them to be false or recklessly made them without any knowledge of the truth and as a positive assertion.  Defendants made such material representations of fact with the intent that those hearing or reading these representations, be it Plaintiff's business relations or the USPTO, should act upon the representations.  These representations were relied upon by those receiving them, including, the USPTO, which will not permit a trademark application to proceed without a declaration signed under penalty of perjury.  As a direct and proximate result of such material misrepresentations of fact, Defendants have caused injury.  Plaintiff has and will continue to suffer injury as a result of such willfully false representations of material fact.

61. Defendants have committed fraud and Plaintiff has suffered damages as a result.  Defendants had a contractual duty to Plaintiff to obtain trademark protection on Plaintiff's behalf but, instead, engaged in fraud in direct violation of this duty.  Additionally, as a result of the willful and deliberate nature of Defendants' unlawful activities, Plaintiff is entitled to exemplary damages.

62. Under Texas law, a civil conspiracy is "a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex. 1996).  The essential elements of such a cause of action are as follows: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Operation Rescue-Nat'l v. Planned Parenthood of Houston & Southeast Tex., Inc.*, 975 S.W.2d 546, 558-60 (Tex. 1998) (citing *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)).  Civil conspiracy is a derivative tort because a defendant's liability for such conspiracy "depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *See Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) (citing *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925 (Tex. 1979)).

63. As set out above, Defendants H. Ayoub and M. Ayoub have conspired together to accomplish the unlawful purposes (torts) complained of herein.  H. Ayoub and M. Ayoub are working in active concert together.  They have had numerous meetings of the mind on the objects of their courses of action, for example, their meeting with MMG on Christmas day during which they wrongfully asserted their Saudi Trademark; and their work together via Rhino SMSI in the United States and Saudi Arabia.  As a proximate result of the civil conspiracies

carried out by H. Ayoub and M. Ayoub, Plaintiff has suffered damages.  As such, Defendant H. Ayoub has committed a civil conspiracy.

64. Unfair competition under Texas law is an "umbrella for statutory and non-statutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters."  *United States Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 217 (Tex. App.—Waco 1993, writ denied) (citing *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir. 1974)).  "Within the broad scope of unfair competition are the independent causes of action such as trade-secret law, 'palming off' or passing off, and misappropriation[.]"  *Id.* (citations omitted).  However, "[w]ithout some finding of an independent substantive tort or other illegal conduct . . . liability cannot be premised on the tort of 'unfair competition.'"  *Schoellkopf v. Pledger,* 778 S.W.2d 897, 904-05 (Tex. App.—Dallas 1989, writ denied).

65. A plaintiff may prevail on an unfair competition claim by establishing that "(1) the plaintiff's trade name has acquired a secondary meaning through usage; and (2) the similarity of the name used by the defendant would be likely to confuse the public."  *Associated Tel. Directory Publishers, Inc. v. Five D's Publ'g Co.,* 849 S.W.2d 894, 898 (Tex. App.—Austin 1993, no writ) (citing *Hudgens v. Goen*, 673 S.W.2d 420, 423 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.)).

66. The measure of damages in an action for unfair competition is lost profits. "To recover for a loss of profits, it is not necessary that the loss be susceptible to exact calculation . . . [i]t is sufficient that the amount of loss is shown by competent evidence with reasonable certainty."  *White v. Southwestern Bell Telephone Co., Inc.*, 651 S.W.2d 260, 262

(Tex. 1983) (citing *Southwest Battery Corporation v. Owen,* 131 Tex. 423, 115 S.W.2d 1097, 1098 (1938)).

67. Based on the Findings of Fact, Defendants' use of Plaintiff's RHINO Trademarks in connection with its business activities constitutes an unlawful appropriation of Plaintiff's exclusive rights in and to its RHINO Trademarks, and such unauthorized use has caused and will continue to cause damage and irreparable injury to Plaintiff.

68. Defendants' use of Plaintiff Rhino MCI's RHINO Trademarks in connection with their business activities has and will damage Plaintiff's business reputation by leading the trade and public to believe that the spray-on products offered by Defendants are approved of or sponsored in this District and elsewhere by Plaintiff.  Such unauthorized use of Plaintiff's RHINO Trademarks or variants thereof will continue to cause injury to Plaintiff's business reputation and dilute the distinctiveness of its RHINO Trademarks, all of which constitutes irreparable harm to Plaintiff.

69. Based on the evidence, the tortious conduct of Defendants has interfered with Plaintiff's ability to conduct its business, to Plaintiff's detriment, and constitutes unfair competition.  Defendants' unfair competition was willful and deliberate and entitles Plaintiff to enhanced damages.

70. Defendant Eurotex, through Defendant H. Ayoub, and its successor or related companies entered into the Agreement and related amendment with Plaintiff through its predecessor, Rhino Systems International, Inc.  (*See* Pl.'s Trial Ex. I and J).  The Agreement is a valid, enforceable contract.  Plaintiff performed or tendered its obligations under the Agreement. By virtue of the numerous actions of Defendants evidenced herein, Defendants have violated the Agreement's IP provisions, and such breach has damaged Plaintiff.  As such, Defendants are

liable for breach of the Agreement.  *See Residential Dynamics, LLC v. Loveless*, 186 S.W.3d 192, 198 (Tex. App.—Fort Worth 2006, no pet.) (citing *Renteria v. Trevino*, 79 S.W.3d 240, 242 (Tex. App.—Houston [14th Dist.] 2002, no pet.)) (listing elements of a breach of contract claim).

71. During the Agreement's term, Defendants received from Plaintiff valuable information which Plaintiff considered confidential and trade secret information.  Defendants continued to have an ongoing obligation under the Agreement not to use or disclose such confidential or trade secret information, and Defendants have violated this duty.

72. Various provisions of the Agreement are relevant for the Court's purposes here, including ¶¶ 10.3, 14.2, 18.2, 18.4, 18.5, 18.6, 18.7, 18.8, 18.9, and 19.  (*See* Pl.'s Trial Ex. I).

73. Nearly every one of the express restrictions on use of the RHINO Trademarks, RHINO Original Works, confidential information, and other RHINO IP have been wholly and irrefutably disregarded and breached by Defendants.  For example, Defendants failed to comply with Plaintiff's directives and express requirements regarding Plaintiff's IP by failing to secure trademark registrations of the RHINO Trademarks in Plaintiff's name in the Territory. Furthermore, Defendants' present assertions that they own any rights whatsoever in the RHINO Trademarks, RHINO Trademarked Products, RHINO Original Works, or other RHINO IP is a direct affront to the clear, express language of the Agreement.  Defendants have damaged and endangered Plaintiff's RHINO IP, and they have continued to use this IP for purposes that are expressly contrary to the Agreement.  Additionally, Defendants assertions in the United States, the Territory, particularly Saudi Arabia, and elsewhere to their rights to Plaintiff's IP violates the Agreement's provision that Defendants not assert any claim to the goodwill, reputation, or ownership rights maintained by Plaintiff in the RHINO IP.  Defendants failure to secure

trademark protection on behalf of Plaintiff in the Territory, their obtainment of the Saudi Trademark, and their attempt to obtain trademark protection with the USPTO are clear and willful breaches of the Agreement's provisions that require Defendants to cooperate in the registration of distributor as a registered user of any one of the RHINO Trademarks under applicable federal, state, and/or local regulation; that, upon termination of the Agreement, requires Defendants to take all steps to ensure it is no longer a registered user of the RHINO Trademarks; and that requires Defendants to obtain registration of the RHINO Trademarks in the Territory.   Additionally, Defendants misappropriation of Plaintiff's confidential information breaches the Agreement.

74. Plaintiff has been injured by Defendants' breaches of the express provisions of the Agreement, and as a consequence, Plaintiff has suffered actual damages.

75. The Saudi Trademark was improperly procured by Defendants in breach of the Agreement.

76. Additionally, as a result of Defendants' breach of the Agreement, Plaintiff is entitled to an award of attorneys' fees.  *See* Tex. Civ. Prac. & Rem. Code § 38.001.

77. Based on Defendants' threats and assertions set out in the Findings of Fact, an actual case or controversy exists regarding the ownership and rights associated with certain of Plaintiff's RHINO Trademarks, and their associated goodwill, the RHINO Original Works, and the RHINO IP worldwide.  Per the Declaratory Judgments Act, 28 U.S.C. § 2201 *et seq.,* the Court declares that Plaintiff Rhino MCI owns all right, title and interest in and to the RHINO Trademarks, and their associated goodwill, the RHINO Original Works, and the RHINO IP worldwide and that defendants have no rights in such marks, works, or IP whatsoever.  The

Court further declares that the Saudi Trademark was improperly procured by Defendants in breach of the Agreement.

78. Plaintiff is entitled to an award of its actual damages suffered as a result of the Defendants unlawful activities. At the conclusion of the Contempt Hearing, the Court found that Defendants' wrongful activities violating the preliminary injunction order, and hence Plaintiff's rights set out herein, for the time period from July 14, 2006, to January 14, 2007, caused Plaintiff to suffer monetary damages in the amount of one million, seven hundred forty-five thousand, six hundred sixteen dollars ($1,745,616.00) ($7,616.00 in costs, and $1,738,000.00 in actual damages/lost profits). As such, the Court's findings and conclusions herein provide further support and an independent legal basis from contempt of court supporting an award to Plaintiff of $1,745,616.00 total in damages for the time period from July 14, 2006, to January 14, 2007. Based on the findings made during the Contempt Hearing and Caston's testimony, the Court finds that the Defendants' wrongful conduct has damaged Plaintiff in an amount of at least two hundred forty seven thousand ($247,000.00) per month from January 14, 2007, to October 14, 2007, equaling an additional two million, twenty three thousand dollars ($2,023,000.00).

79. As an alternative, Plaintiff is also entitled to elect whether it desires to receive an award of statutory damages attributable to the counterfeit and copyright infringement evidenced above.

80. This case is exceptional based on the willful and malicious actions of Defendants. As such, Plaintiff is entitled to a trebling of an award of its actual damages.

81. Additionally, Plaintiff is entitled to an award of its costs and attorney's fees in this action and shall provide such proof by way of affidavit.

82. Based on the foregoing, Plaintiff is entitled to the entry of a permanent injunction of the scope set out in this Court's Memorandum Opinion and Order of July 14, 2006 (Doc 27).

83. In conclusion, the unlawful injurious acts of Defendants have been willful, deliberate, and malicious and warrant a finding that this case is exceptional, that such acts have caused injury to Plaintiff and Plaintiff's property, that enhancement or trebling of damages is appropriate, that Plaintiff be awarded its reasonable attorney fees, and that Defendants' wrongful conduct be permanently enjoined.

84. Defendant M. Ayoub has not been presented with a summons and notice of this lawsuit, nor has a waiver of service been filed.  The Court notes, however, that an order granting injunctive relief "binds . . . who receive actual notice of it by personal service or otherwise: (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)."  Fed. R. Civ. P. 65(d)(2).  Based on the evidence, the Court finds that Defendant M. Ayoub has been acting in concert with the other Defendants.  Accordingly, the permanent injunction shall apply to him.

85. Under Federal Rule of Civil Procedure 4(m), a court must dismiss a defendant without prejudice if the plaintiff has not served process on that defendant within 120 days of filing the complaint, unless the plaintiff can show "good cause" why service was not made within that period.  Fed. R. Civ. P. 4(m).  The complaint in the instant lawsuit was filed on June 22, 2006, and, the docket sheet reflects that Defendant M. Ayoub has never been served, nor has a waiver of service been filed.  Accordingly, the Court hereby DISMISSES without prejudice Defendant M. Ayoub from this action.

To the extent that any Finding of Fact is more properly characterized as a Conclusion of Law, it is ADOPTED as such.  To the extent that any Conclusion of Law is more properly characterized as a Finding of Fact, it is ADOPTED as such.

Additionally, the Court hereby ORDERS that Plaintiff file a proposed final judgment, which addresses Plaintiff's election on the alternative set forth in paragraph 79, within TEN (10) DAYS from the date this Findings of Fact and Conclusions of Law is issued.

SIGNED at Houston, Texas, this 30th day of September, 2008 .

MELINDA HARMON
UNITED STATES DISTRICT JUDGE